# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 21-4467

JOSEPH LABRUZZA, APPELLANT,

AND

No. 20-8562

RANDALL G. MCBRIDE, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 18, 2023)                    Decided January 24, 2024)

*Christopher Glenn Murray*, of Arlington, Virginia, with whom *Kimberly Rae Parke* and *Barton F. Stichman*, both of Washington, D.C., were on the brief for appellant McBride.

*Barbara J. Cook*, of Cincinnati, Ohio, with whom *Matthew D. Hill*, of DeLand, Florida, was on the brief for appellant LaBruzza.

*Lori M. Jemison*, with whom *Richard A. Sauber*, General Counsel; *Mary Ann Flynn*, Chief Counsel; *Carolyn F. Washington*, Deputy Chief Counsel; and *Edward V. Cassidy*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before BARTLEY, *Chief Judge*, and PIETSCH and TOTH, *Judges*.

BARTLEY, *Chief Judge*: A veteran who is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities may be awarded a total disability evaluation based on individual unemployability (TDIU). However, because VA considers marginal employment, including "employment in a protected environment," not to be substantially gainful, a veteran does not need to be unemployed to receive TDIU. 38 C.F.R. § 4.16(a) (2023).

In the separate decisions currently on appeal, the Board of Veterans' Appeals (Board) denied veterans Joseph LaBruzza and Randall G. McBride entitlement to TDIU for periods when they were employed, finding that their respective occupations were substantially gainful. LaBruzza

Record (R.) at 5-35,[1] McBride R. at 3-9. As relevant here, although the Board concluded that neither veteran was engaged in "employment in a protected environment," the Board defined that phrase differently in each case. *Compare* LaBruzza R. at 32-33, *with* McBride R. at 7.

Mr. LaBruzza and Mr. McBride timely appealed their respective Board decisions, and the Court has jurisdiction to review those decisions pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). Their appeals were consolidated and referred to a panel of the Court, with oral argument,[2] to address the meaning of the phrase "employment in a protected environment" in § 4.16(a). For the reasons that follow, we hold that this phrase is unambiguous and means a lower-income position that, due to the veteran's service-connected disability or disabilities, is shielded in some respect from competition in the employment market. Because the Board did not apply this definition to either veteran's case or make the necessary factual findings to do so, we will set aside the appealed portions of Mr. LaBruzza's March 9, 2021, and Mr. McBride's September 3, 2020, Board decisions and remand the matters for further development and readjudication consistent with this decision.

## I. FACTS

### A. Joseph LaBruzza

Mr. LaBruzza served on active duty in the U.S. Navy from August 1967 to July 1971. LaBruzza R. at 1045. He is currently service connected for PTSD, residuals of prostate cancer, tinnitus, inactive chronic duodenal ulcer, erectile dysfunction, and hearing loss, LaBruzza R. at 28, and is receiving TDIU effective July 1, 2018, the first day of the month after he retired, LaBruzza R. at 6. Mr. LaBruzza's appeal stems from a July 2010 claim for service connection for PTSD and prostate cancer, LaBruzza R. at 1146-55, and an associated June 2019 TDIU application filed during the ensuing appeal of the PTSD claim, LaBruzza R. at 423-25. *See* LaBruzza R. at 29-30.

---

[1] In Mr. LaBruzza's decision, the Board granted entitlement to an increased initial 50% disability evaluation for post-traumatic stress disorder (PTSD) prior to June 20, 2019, and TDIU effective July 1, 2018. LaBruzza R. at 5-6. Because those determinations are favorable to the veteran, the Court will not disturb them. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007) ("The Court is not permitted to reverse findings of fact favorable to a claimant made by the Board pursuant to its statutory authority."), *aff'd in part, dismissed in part sub nom. Medrano v. Shinseki*, 332 F. App'x 625 (Fed. Cir. 2009). The Board also denied Mr. LaBruzza entitlement to PTSD evaluations higher than 50% prior to June 20, 2019, and higher than 70% since that date. LaBruzza R. at 5-6. Because the veteran does not challenge those portions of his Board decision, the appeal of those issues will be dismissed. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-85 (2015) (en banc) (declining to review the merits of an issue not argued on appeal and dismissing the appeal of that issue); *Cacciola v. Gibson*, 27 Vet.App. 45, 48 (2014) (same).

[2] *LaBruzza & McBride v. McDonough*, Nos. 21-4467, 20-8562, Oral Argument, available at https://www.youtube.com/watch?v=6XE2qlc9tcQ.

Mr. LaBruzza was employed in a municipal building inspector's office from August 1999 to June 2018, when he was forced to retire. LaBruzza R. at 160, 423-24. During his last full year of employment in 2017, he earned $198,147. *See* LaBruzza R. at 423.

Throughout the period on appeal, Mr. LaBruzza described PTSD symptoms and prostate cancer residuals that interfered with his employability. *See, e.g.*, LaBruzza R. at 733 (Nov. 2011 reports leaving work early to avoid escalating conflicts with his supervisor), 729-30 (June 2013 concerns that work conflicts might become physical due to decreased impulse control and growing impatience), 724-25 (May 2015 report of the same), 592 (Feb. 2018 report of suspension from work, disciplinary warnings, counseling, and extended work absences of up to 2 months at a time, all due to paranoia, uncontrollable temper, and inappropriate, disrespectful, and avoidant behavior), 334 (July 2019 VA examiner's assessment that PTSD caused a variety of serious symptoms, including significant social isolation, aggressive behavior, and panic attacks, that affected work performance and attendance), 158-60 (April 2020 report of work difficulties, including taking anger out on coworkers, absenteeism, mistakes due to PTSD, and work impacts due to urinary incontinence).

Mr. LaBruzza stated that his employer gave him "special treatment" because he was a veteran and that others had told him that, in a typical work environment, his behavior would have cost him his job. LaBruzza R. at 160, 592. A private psychologist in February 2018 and a private vocational counselor in April 2020 both opined that the veteran had been incapable of performing nonsheltered, substantially gainful employment for many years. *See* R. at 592, 604 (Feb. 2018 psychologist's opinion), 175 (April 2020 vocational counselor's opinion).

In the March 2021 decision on appeal, the Board denied Mr. LaBruzza entitlement to TDIU prior to July 1, 2018, because it found that he was engaged in substantially gainful employment at that time. LaBruzza R. at 26-35. As relevant here, the Board determined that the veteran's employment with the building inspector's office from August 1999 to June 2018 was not "in a protected environment" because that employment did not result in lost income, legally required accommodations allowed him to remain employed for many years, and there was no evidence that he was hired for a charitable, rehabilitative, or therapeutic purpose. LaBruzza R. at 32-34.

### B. Randall G. McBride

Mr. McBride served on active duty in the U.S. Navy from March 1984 to May 1986. McBride R. at 1243. He is currently service connected for anxiety disorder and hydrocephalus and

is receiving TDIU effective November 1, 2013. McBride R. at 111. Mr. McBride's appeal stems from a May 2007 claim for an increased evaluation for anxiety disorder, McBride R. at 2115-16, which the Board found reasonably raised the issue of entitlement to TDIU, McBride R. at 4 (citing McBride R. at 1864 (Oct. 2014 Board decision)).

Mr. McBride has been unable to find full-time employment since his previous employer, BAE Systems, closed in November 2013. McBride R. at 1878-79; *see* McBride R. at 5. When employed, his service-connected disabilities caused considerable occupational impairment. *See, e.g.*, McBride R. at 1878-1888 (Sept. 2014 Board testimony that while working he had 10 to 15 panic attacks per day, his employer overlooked mistakes and assigned others to finish his jobs, and he remained employed because supervisors recognized that he "knew [his] stuff better than anybody"), 70-71 (Dec. 2018 statement that his manager altered his job requirements to accommodate his disabilities, allowed him to take breaks during panic attacks, and was more lenient on him following verbal altercations), *id.* (noting employee database with "protected" next to his name).

In September 2020, after several appeals and remands from this Court, the Board issued the decision on appeal denying entitlement to TDIU prior to November 1, 2013. McBride R. at 3-9. The Board found, in relevant part, that the veteran's prior employment with BAE Systems was not protected because he was retained and provided accommodations based on his value to the company rather than for altruistic or personal reasons, his disabilities did not result in lost income, and legally required accommodations permitted him to maintain substantially gainful employment. McBride R. at 7-8. The Board dismissed "[t]he fact that the [v]eteran's employer may have made additional accommodations above and beyond what they are required to do by law" because, per the veteran's testimony, "these extra accommodations were granted due to his value as an employee." McBride R. at 8.

## II. LEGAL BACKGROUND

In addition to setting forth schedular evaluation requirements for TDIU,[3] § 4.16(a) provides that marginal employment "shall not be considered substantially gainful employment" for TDIU purposes. The regulation then describes when employment qualifies as marginal:

---

[3] The Board found that Mr. LaBruzza and Mr. McBride meet § 4.16(a)'s schedular evaluation requirements for the periods on appeal. *See* LaBruzza R. at 28; McBride R. at 5.

4

[M]arginal employment generally shall be deemed to exist when a veteran's earned annual income does not exceed the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person. Marginal employment may also be held to exist, on a facts found basis (includes but is not limited to employment in a protected environment such as a family business or sheltered workshop), when earned annual income exceeds the poverty threshold.

38 C.F.R. § 4.16(a). Finally, the regulation directs that "[c]onsideration shall be given in all claims to the nature of the employment and the reason for termination," but not "the existence or degree of nonservice-connected disabilities or previous unemployability status." *Id*.

The dispute in this case centers on the meaning of "employment in a protected environment," an issue that the Court has previously addressed. When we examined the phrase in *Cantrell v. Shulkin*, we found it ambiguous because neither § 4.16 nor any surrounding regulation explicitly defined it. 28 Vet.App. 382, 390 (2017). At that time, the Secretary said this ambiguity was by design, as VA had "purposely chosen not to prescribe a precise definition of 'protected environment'" to "allow[] the factfinder to make the determination on a case-by-case basis." *Id*. (internal quotations omitted). The Court declined to defer to this position, questioning how hundreds of VA adjudicators across the country could consistently apply that undefined phrase without guidance. *Id*. Finding that it was VA's responsibility to define the terms in its own regulations, the Court remanded for the Secretary to articulate a standard definition. *Id*. at 391-93.

In the ensuing 4 years, the Secretary did not promulgate an official definition or otherwise provide to VA adjudicators guidance as to how to apply the phrase. The Secretary finally offered a definition when ordered to do so by another panel of the Court in *Arline v. McDonough*. *See* 34 Vet.App. 238, 246 (2021). His litigating position in that case was that "employment in a protected environment" meant employment in "a non-competitive workplace separated from workplaces in the open labor market and in which hiring and compensation decisions are motivated by a benevolent attitude toward the employee." *Id*. at 247. Because the *Arline* Court affirmed the Board's denial of TDIU on other grounds, we did not address the propriety of this proffered definition. *See id*. at 242, 256. Over 2 years have passed since the *Arline* decision issued, and the Secretary has not formally or informally acted to disseminate his interpretation to VA adjudicators.

## III. THE PARTIES' ARGUMENTS

Against this backdrop we review the parties' arguments. Mr. LaBruzza's and Mr. McBride's overarching arguments are quite similar: Both assert that the Board provided inadequate reasons

or bases for finding that their respective jobs did not qualify as "employment in a protected environment" because the Board, in deciding that issue, applied an incorrect standard and overlooked or did not adequately address potentially favorable evidence. LaBruzza Brief (Br.) at 7-13; LaBruzza Reply Br. at 1-5; McBride Br. at 9-17; McBride Reply Br. at 1-11. The Secretary disputes these contentions and urges the Court to affirm the Board decisions as well supported and in accordance with governing law. Secretary's LaBruzza Br. at 6-13 (citing, among other things, *Cantrell*, 28 Vet.App. at 396 (Lance, J., concurring)); Secretary's McBride Br. at 4-16 (citing, among other things, *Cantrell*, 27 Vet.App. at 387, and *Arline*, 34 Vet.App. at 249-50, 256).

The crux of the issue is that the parties disagree as to what "employment in a protected environment" means and whether the Court is bound by its prior conclusion in *Cantrell* that the phrase is ambiguous. Mr. LaBruzza asserts that the phrase is unambiguous and asks the Court to reevaluate its contrary determination in *Cantrell* in light of the U.S. Supreme Court's intervening decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). LaBruzza Supplemental Memorandum of Law (Supp. Memo) at 1, 4-7. According to Mr. LaBruzza, "employment in a protected environment" plainly means employment "in which the employee is protected from the economic consequences of his or her inability to perform the physical or mental tasks required by the substantially gainful employment at issue." *Id*. at 1. He argues that this definition is "tethered" to a veteran's ability to perform the physical and mental acts required for substantially gainful employment and that the proper way to account for this ability is to include in the definition "employment in which accommodations beyond those reasonably required by the ADA [(Americans with Disabilities Act)] are provided, regardless of the employer's motive." *Id*. at 2-4.

Mr. McBride agrees that "employment in a protected environment" is unambiguous and that the Court is not bound by *Cantrell*'s contrary conclusion. McBride Supp. Memo at 3-4. Citing the ordinary, dictionary definition of "protected," he asserts that the phrase means "employment in which the veteran is shielded from the economic consequences of the employment market." *Id*. at 4-6. Like Mr. LaBruzza, Mr. McBride asserts that the correct way to assess whether employment is "in a protected environment" is to determine whether it "provides protections beyond those in the commercial job market." *Id*. at 6 (clarifying that the phrase means "more than employment subject to the civil rights and other protections of federal, state, and local law," such as the accommodations required by the ADA or Uniformed Services Employment and Reemployment Rights Act). In Mr. McBride's view, "the rationale or motivation for an employer providing a

protected environment is not relevant to VA's analysis, nor is the size of the business or whether it provides protection to others, including other family members, other [v]eterans, or other people with disabilities"; rather, "[a]ll that matters is that the employee is protected from adverse employment consequences, for whatever reason." *Id*. at 7.

The Secretary believes that stare decisis prohibits a three-judge panel of the Court revisiting its determination in *Cantrell* that the phrase is ambiguous. Secretary's Supp. Memo at 7. But because the Court did not undertake to define the phrase in *Cantrell*, the Secretary urges us to resolve the ambiguity by deferring to his proposed definition; namely, that "employment in a protected environment" is "a type of non-competitive employment for disabled persons, separated from competitive workplaces, where hiring and compensation decisions are motivated by the employer's benevolence towards the employee." *Id*. at 1, 7-8. He requests that the Court defer to his definition because it is reasonable in light of the regulation's text and structure, the purpose of TDIU, and how other agencies use similar terms; represents his official position; involves an area in which he has substantial expertise; and reflects his fair and considered judgment on the issue. *Id*. at 1-12. Alternatively, the Secretary asks the Court, if we find deference not warranted, to resolve ambiguity in his favor by applying traditional tools of regulatory construction. *Id*. at 9, 12.

As to deference, both veterans argue that the Court should not defer to the Secretary's proposed definition because it is a convenient litigating position that is not the product of his fair and considered judgment and is unreasonably narrow or otherwise inconsistent with the language of § 4.16(a). LaBruzza Supp. Memo at 7-10; McBride Supp. Memo at 9-11.

## IV. ANALYSIS

### A. *Cantrell* and the Intervening *Kisor* Decision

As noted above, six years ago the *Cantrell* Court determined that the phrase at issue was ambiguous. 28 Vet.App. at 390. Since then, the U.S. Supreme Court decided *Kisor v. Wilkie*, in which it clarified the framework that courts should use when interpreting undefined regulatory terms. The petitioner in *Kisor* essentially asked the Supreme Court to overrule the *Auer v. Robbins*, 519 U.S. 452 (1997), deference doctrine, which dictated that courts should generally defer to agencies' reasonable readings of ambiguous regulations. 139 S. Ct. at 2408. In *Kisor*, the Supreme Court reaffirmed that *Auer* deference "retains an important role in construing agency regulations" and indicated that it was expressly "reinforcing" and "further develop[ing]" *Auer*'s limits so that

the resulting deference doctrine "is potent in its place, but cabined in its scope." 139 S. Ct. at 2414-15, 2408. Deference, it explained, is warranted only if a regulation is "genuinely ambiguous"; that is, where the traditional tools of construction—examination of the text, structure, history, and purpose of the regulation—have been exhausted and no single interpretation prevails. *Id*. at 2415. Even then, *Auer* deference is appropriate only when the proffered interpretation is reasonable; is "the agency's 'authoritative' or 'official position,' rather than any mere ad hoc statement not reflecting the agency's views"; implicates the agency's expertise; and reflects the agency's "fair and considered judgment," not a "convenient litigating position" or post hoc rationalization to "defend past agency action against attack." *Id*. at 2416-17. And when the reasons underlying *Auer* deference "do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading, except to the extent it has the 'power to persuade.'" *Id*. at 2414 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012)); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Mr. Kisor's case was remanded back to the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) to reexamine whether the term that the Federal Circuit originally found ambiguous was "genuinely ambiguous" under the new guidance. The Federal Circuit concluded, based on the term's text, context, and history, that the term was in fact unambiguous. *Kisor v. Wilkie*, 995 F.3d 1316, 1322-26 (Fed. Cir. 2021). Similarly, in *United States v. Adair*, the U.S. Court of Appeals for the Third Circuit post-*Kisor* reevaluated several cases that had not engaged in what that court called the "now-essential [*Kisor*] analysis," in that they had not exhausted the traditional tools of construction before reaching a conclusion as to ambiguity. 38 F.4th 341, 350 (3d Cir. 2022).

Given these developments since *Cantrell*, the Court concludes that to conform with controlling Supreme Court precedent we must revisit the ambiguity question. After all, in *Cantrell* we concluded that the phrase was ambiguous after examining the regulation's text and structure, but *Kisor* was clear that courts should review not only text and structure but also history and purpose before declaring a regulation ambiguous. *Compare Cantrell*, 28 Vet.App. at 390, *with Kisor*, 139 S. Ct. at 2415. *Kisor* was also clear that "a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved." 139 S. Ct. at 2415.

8

B. A Closer Look at "Employment in a Protected Environment"

With *Kisor* as a guide, we address whether we can determine the meaning of "employment in a protected environment"—in which case the regulation may be declared unambiguous. "Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure." *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015). If the meaning is clear from that investigation, then "that is 'the end of the matter.'" *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)). If not, the Court must look to other sources, including the history and purpose of the regulation, to discern its meaning; "only when [the] legal toolkit is empty and the interpretive question still has no single right answer" can the Court conclude that the regulation at issue is genuinely ambiguous. *Kisor*, 139 S. Ct. at 2415.

*1. Analyzing the Text, Structure, and History of the Regulation:*
*Insulation from the Competitive Labor Market*

As outlined above, § 4.16(a) directs that marginal employment for TDIU purposes may "be held to exist, on a facts found basis (includes but is not limited to employment in a protected environment such as a family business or sheltered workshop), when earned annual income exceeds the poverty threshold." The regulation does not include an express definition of "employment in a protected environment," and no other VA regulation contains that phrase.[4] However, § 4.16(a) contains two examples of protected-environment employment that assist with discerning the phrase's meaning. Significantly, the examples share two common characteristics that bring "employment in a protected environment" into focus.

The first common characteristic of the examples is that family businesses and sheltered workshops offer employment that is insulated, to a degree, from the open labor market. *See, e.g.*, AMERICAN PSYCHOLOGICAL ASSOCIATION DICTIONARY OF PSYCHOLOGY 977 (2d ed. 2015) (defining "sheltered workshop" as "[a] rehabilitation facility that provides a controlled, noncompetitive, supportive working environment and individually designed work settings for people with disabilities"). A second common characteristic is that employment in a family business

---

[4] "Protected environment," with no reference to employment, is used in 38 C.F.R. § 3.278 to describe medical expenses deductible for pension purposes and refers to an institutional living environment necessary to ensure a veteran's physical safety. To the extent that "protected environment" in § 3.278 describes a veteran shielded from outside harm, it is consistent with the § 4.16(a) definition that the Court reaches below.

or sheltered workshop is based on something other than the strict qualifications of the employee. *See, e.g.*, Pasquale J. Accardo & Barbara Y. Whitman, DICTIONARY OF DEVELOPMENTAL DISABILITIES TERMINOLOGY 283 (1996) (explaining that sheltered workshops "provide employment based on the person's ability to produce, rather than on a competitive employment model"). Together, these unifying characteristics point toward employment that is excepted, in some respect, from the competitive labor market.

But, significantly, § 4.16(a)'s examples of protected environment are nonexhaustive. *See Crews v. McDonough*, 36 Vet.App. 67, 81 (2023) (noting that drafters commonly introduce nonexhaustive lists with terms like "such as"). The final sentence of § 4.16(a) underscores this point, mandating that "[c]onsideration shall be given in all [TDIU] claims to the nature of the employment." In other words, the mere fact that a veteran is employed in a family business, for example, is not dispositive; what ultimately matters for protected-environment TDIU is the nature of the veteran's employment, which, as noted, must be excepted in some way from the competitive labor market.

While helpful, this observation alone does not resolve all ambiguity as to the meaning of "employment in a protected environment." We therefore continue our *Kisor* analysis, turning next to dictionaries to determine the phrase's ordinary meaning. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *Nielson v. Shinseki*, 23 Vet.App. 56, 59 (2009) (noting that it "is commonplace to consult dictionaries to ascertain a term's ordinary meaning"), *aff'd*, 607 F.3d 802 (Fed. Cir. 2010). Unfortunately, the parties did not identify, nor can the Court locate, any general use dictionary that defines "employment in a protected environment."

The lack of a definition could indicate that the phrase is a term of art with a specific meaning within the medical or vocational community. *See Cantrell*, 28 Vet.App. at 390. That would certainly assist the Court in determining the ambiguity question at issue here, but the specialized dictionaries and federal government authorities cited by the parties suggest that it is not a term of art. None of those resources defines "employment in a protected environment" or uses it as a term of art—instead, they generally use "protected environment" to describe "sheltered employment." But the resources do not equate the terms or otherwise indicate, as the Secretary contends, that "employment in a protected environment" is a subset of "sheltered employment." *See* McBride Supp. Memo at 7-9 (citing 26 C.F.R. § 7.105-2 (2018)); Secretary's Supp. Memo at

1-4 (collecting resources). In fact, the Secretary previously conceded that the cited resources "fall short of establishing that the term has an established meaning such that it qualifies as a term of art." *Arline*, No. 18-0765, Secretary's Supp. Br. at 8.

The history of § 4.16 confirms the conclusion that "employment in a protected environment" and "protected environment" are not terms of art. In 1990, in response to a government report that found that VA adjudicators made inconsistent decisions concerning the meaning of marginal employment, VA proposed to add the current poverty-threshold-based marginal employment and facts-found marginal employment standards to § 4.16(a), but it did not mention "employment in a protected environment." *Definition of Marginal Employment in Consideration of TDIU*, 54 Fed. Reg. 35,507, 35,508 (Aug. 28, 1989) (proposed rule). VA added the "protected environment" phrase to the final rule in response to a commenter's suggestion that VA define factors that would support a finding of marginal employment when earned income exceeds the poverty threshold. *Definition of Marginal Employment in Consideration of TDIU*, 55 Fed. Reg. 31,579, 31,580 (Aug. 3, 1990) (final rule). But instead of defining protected employment or enumerating relevant factors for consideration, VA merely included the two cited examples of protected employment. *Id*.

This history reinforces that VA was not using "employment in a protected environment" as a term of art, as it did not point to any authority for the phrase or for the examples provided. *Cf. id*. It therefore appears that VA intended to use the phrase to capture various types of employment that could be considered protected on a facts-found basis and to not be constrained by a specialized definition of the phrase that was in use at the time. *Accord Cantrell*, 28 Vet.App. at 390-91. Given that, we return to general use dictionaries to see if we can discern additional meaning from the individual words that make up the phrase.[5]

Breaking down "employment in a protected environment" in this manner provides further clarity, as the general use dictionaries we consulted define "protected" as shielded or covered from exposure, injury, damage, or destruction, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/protected (last visited Nov. 3, 2023), and guarded or kept safe from harm, injury, or attack, NEW OXFORD AMERICAN DICTIONARY 1403 (3d ed.

---

[5] This approach is especially apt here, as one general use dictionary we consulted described "protected environment" as a collocation—a series of words that co-occur more frequently than by chance and which, as opposed to an idiom, can be understood from the meanings of those individual words. CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/example/english/protected-environment (last visited Nov. 3, 2023).

11

2010); THE AMERICAN HERITAGE DICTIONARY 995 (2d college ed. 1982). From these dictionaries we can surmise that "employment in a protected environment" was meant to refer to a working situation that is shielded, covered, or guarded from an outside source of harm. And from our earlier analysis of § 4.16(a)'s examples, we know that the referenced harm is the veteran's inability to secure or follow a substantially gainful occupation in the open labor market because of service-connected disabilities. Taken together, these aspects of § 4.16(a) confirm the conclusion that "employment in a protected environment" is meant to encompass employment that is shielded in some respect from competition in the employment market.

We use the words "in some respect" deliberately here to convey that employment need not be *completely* shielded or separated from the employment market to qualify as being in a protected environment. Contrary to the Secretary's contention, *see, e.g.*, Secretary's Supp. Memo at 1, there is simply no support in § 4.16(a) for such an interpretation.

### 2. Further Analyzing the Text, Structure, and Purpose of the Regulation: The Role of Earned Annual Income

There is more that we can learn from the text and structure of § 4.16.[6] Its title, "total disability ratings for compensation based on unemployability of the individual," makes clear that the employability of the individual seeking TDIU is key to the benefit. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotations omitted)). The first sentence of § 4.16(a) specifies what unemployability means for TDIU purposes: an individual must be "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). That inability would generally manifest in the veteran being unable to obtain gainful employment or having difficulty retaining or maintaining such employment. But, obviously, being unemployed is not an immutable requirement for TDIU since § 4.16(a) expressly allows TDIU eligibility for veterans engaged in marginal employment. *See Arline*, 34 Vet.App. at 245; *Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 71 (2016). Still, the text and structure of § 4.16(a) make clear that awarding TDIU to veterans who are employed is not the norm. Only veterans who meet the requirements for marginal employment may be eligible for TDIU while still holding a job and, per § 4.16(a), the primary gauge for

---

[6] For purposes of the following discussion, we assume that the schedular requirements for TDIU or extraschedular TDIU are met. *See* 38 C.F.R. § 4.16(a), (b).

determining whether employment is marginal is whether income is under the poverty threshold for one person.

But, as noted earlier, there is a further exception to poverty-threshold-based marginal employment—facts-found marginal employment. Facts-found marginal employment, the concept relevant to Mr. LaBruzza's and Mr. McBride's cases, is explained in § 4.16(a) as an exception to the general rule that earned annual income is the decisive factor for determining eligibility for marginal employment. *See* 38 C.F.R. § 4.16(a) (providing that, in limited situations including but not limited to "employment in a protected environment," marginal employment "may also be held to exist, on a facts-found basis . . . , when earned annual income exceeds the poverty threshold"). As an exception to poverty-threshold-based marginal employment—which in turn is an exception to the norm of TDIU usually being awarded to veterans who are unemployed—facts-found marginal employment, including employment in a protected environment, must be read narrowly so that it does not utterly supplant the general rule that annual income, limited by the poverty threshold, is a key criterion for determining TDIU eligibility. *See, e.g.*, *Rossy v. Shulkin*, 29 Vet.App. 142, 144-45 (2017) (narrowly construing a regulatory exception to avoid requiring VA to apply that exception "as a matter of course in every hearing loss claim").

The regulation itself and our prior precedent as to TDIU provide helpful guidance in cabining the facts-found protected environment exception to the marginal employment exception. As noted, § 4.16(a) designates earned annual income as the primary touchstone for determining whether employment is marginal, and caselaw has long highlighted the importance of a veteran's income in distinguishing between substantially gainful and marginal employment. *See, e.g.*, *Ray v. Wilkie*, 31 Vet.App. 58, 73 (2019) (holding that "substantially gainful employment" has an economic, income-based component); *Faust v. West*, 13 Vet.App. 342, 355 (2000) (reviewing a veteran's income to conclude that he was not engaged in marginal employment). Given the central role that earned annual income plays in the marginal employment assessment, and in the TDIU determination itself, one can only conclude that a veteran's earned annual income must factor into the protected-environment inquiry. Otherwise, if income played no role whatsoever, the protected-environment exception could swallow the general rule. For the purposes of ascertaining the meaning of employment in a protected environment, the Court concludes that the phrase limits such employment to lower-income positions that produce earned annual income that exceeds the poverty threshold. And while the fact-specific nature of the protected-environment inquiry, as well

as institutional limitations, prevents the Court from setting a bright-line standard for what constitutes a lower-income position, the extent to which a veteran's earned annual income exceeds the poverty threshold is clearly a key regulatory consideration.[7]

An inquiry into veterans' earned annual income when assessing whether they meet facts-found protected-environment eligibility is consistent with the purpose of TDIU, which, as noted, is to compensate veterans for employability lost due to service-connected disabilities. 38 C.F.R. § 4.16(b). That purpose is best served by reserving TDIU for veterans whose service-connected disabilities preclude substantially gainful employment, not by awarding TDIU to veterans, even seriously disabled ones, who are capable of performing such employment. *See Van Hoose v. Brown*, 4 Vet.App. 361, 363 (1993) ("A high rating in itself is a recognition that the impairment makes it difficult to obtain and keep employment. The question [for TDIU] is whether the veteran is capable of performing the physical and mental acts required by employment . . . ."). Differentiating between these situations can be difficult when a veteran is employed, but limiting facts-found protected-environment TDIU to positions that yield lower earned annual incomes ensures that the true purpose of TDIU is not subverted by the facts-found exception. *See Cantrell*, 28 Vet.App. at 396 (Lance, J., concurring).

### 3. Summary and Further Considerations

Thus, by examining the text, structure, history, and purpose of § 4.16(a), the meaning of "employment in a protected environment" has become clear. The phrase unambiguously means employment in a lower-income position that, due to the veteran's service-connected disability or disabilities, is shielded in some respect from competition in the employment market. Given the conclusion that the phrase is unambiguous, we need not address the parties' arguments regarding deference. *See Kisor*, 139 S. Ct. at 2415 ("If uncertainty does not exist, there is no plausible reason for deference."). Section 4.16(a) "just means what it means—and [we] must give it effect, as [we] would any law." *Id*.

Having done so, we must reject the Secretary's argument that "employment in a protected environment" requires evidence of an employer's benevolent intent or motivation for hiring,

---

[7] The Court notes that VA has tools at its disposal to assess a veteran's income level and could make use of them in these rare cases when "employment in a protected environment" is at issue. For example, to aid in making a lower-income-based assessment for employment in a protected environment, VA has reference to its maximum annual pension rate, *see* 38 U.S.C. § 1521; attributable income limits for VA healthcare purposes, *see* 38 U.S.C. § 1722; and other income-based benefit guidelines.

promoting, or continuing to employ a veteran. *See* Secretary's Supp. Memo at 1, 7-8. Although employer intent may bear on the protected environment question, since an individual who was hired for a charitable, rehabilitative, or therapeutic purpose is more likely to be employed in a position with the requisite shielding than a veteran whose employment is based on skillset, training, certification, experience, or other qualifications alone, *see Arline*, 34 Vet.App. at 261 (Bartley, C.J., concurring in part), there is no indication in § 4.16(a) that this factor was meant to be decisive.

We agree to some extent with the appellants' arguments that the concept of "employment in a protected environment" takes into account workplace accommodations required by the ADA. *See* LaBruzza Supp. Memo at 2-4, McBride Supp. Memo at 6. The ADA applies to virtually all employers, including state and local governments, with 15 or more employees and requires employers to provide reasonable accommodations for employees and job applicants with disabilities. 42 U.S.C. §§ 12111(2), (5), 12112(a), (b)(5). The statute thus overlays—and makes reasonable accommodations for disabilities part of—the competitive labor market. In other words, employees who receive reasonable accommodations under the ADA are not being shielded from the competitive labor market; they are working within it under one of the conditions that govern it. Thus, as a general matter, receipt of an ADA accommodation is not by itself evidence that a veteran is working in a protected environment. It also follows from this general proposition that a veteran receiving accommodations beyond those legally required by the ADA is more likely to be able to demonstrate that he or she is employed in a protected environment. *See Arline*, 34 Vet.App. at 258-59 (Bartley, C.J., concurring in part). Conversely, a working veteran who does not require any ADA-mandated accommodation to work is less likely to be able to show that his or her employment is in a protected environment. *See Cantrell*, 28 Vet.App. at 396 (Lance, J., concurring). This much we can discern from the text, structure, history, and purpose of § 4.16(a).

Given the fact-specific inquiry required to determine whether the veteran's employment is in a protected environment, however, we reiterate that these generalities are not categorical or dispositive. They will guide most cases. But the Board may consider any individualized factor or evidence that tends to clarify whether a specific position was shielded in some respect from competition in the employment market. And, of course, the income that a veteran earns from employment must be relatively low to qualify as "in a protected environment." *See supra* pt.

15

IV.B.2; *see also Arline*, 34 Vet.App. at 261 (Bartley, C.J., concurring in part); *Cantrell*, 28 Vet.App. at 396 (Lance, J., concurring).

Although the phrase "employment in a protected environment" may appear fairly broad, this latitude should not be mistaken for laxity. As we have noted, the protected-environment inquiry is highly factual by its very nature. 38 C.F.R. § 4.16(a) (providing that marginal employment may exist "on a facts found basis"). In determining whether a veteran's unique circumstances should be considered "employment in a protected environment," context is critical, and no fact or factor should be dispositive. But just because the concept is not amenable to mechanical classification does not mean that it is unbounded. Employment is not "in a protected environment" simply because a veteran receives workplace accommodations for service-connected disabilities or remains employed despite being occupationally impaired. *See Van Hoose*, 4 Vet.App. at 363. As all the parties agree, a further showing is required to establish that the veteran's position is in fact shielded from competition in the employment market. *See* LaBruzza Supp. Memo at 3-4; McBride Supp. Memo at 6; Secretary's Supp. Memo at 6. And entitlement to protected-environment TDIU, like all other types of TDIU, ultimately depends on whether a veteran's service-connected disabilities render the veteran incapable of performing the mental and physical acts required for substantially gainful employment. *See Ray*, 31 Vet.App. at 72 (citing *Van Hoose*, 4 Vet.App. at 363); *see also Hatlestad v. Brown*, 5 Vet.App. 524, 529 (1993) ("[T]he central inquiry in determining whether a veteran is entitled to a TDIU rating is whether that veteran's service-connected disabilities alone are of sufficient severity to produce unemployability."). Veterans and their advocates seeking to argue entitlement to TDIU during periods in which the veterans were employed should be prepared to submit sufficient evidence for VA to determine entitlement based on the regulatory considerations discussed above.

## V. APPLICATION TO THE CONSOLIDATED APPEALS

Upon review, neither of the Board decisions on appeal used the correct standard for "employment in a protected environment."

In Mr. LaBruzza's case, the Board acknowledged that VA had not defined the phrase, LaBruzza R. at 27, and looked to state law definitions of "sheltered workshop" and Judge Lance's concurrence in *Cantrell* for guidance as to its meaning, LaBruzza R. at 32-34. The Board then concluded that Mr. LaBruzza's nearly 20-year tenure with a municipal building inspector's office

did not qualify as "employment in a protected environment" because he was not hired or employed for a charitable, rehabilitative, or therapeutic purpose; his employment did not result in lost income; and legally required accommodations allowed him to remain employed for many years. LaBruzza R. at 33-34. Although the Board found that Mr. LaBruzza's income in 2017 was "well above the poverty threshold," LaBruzza R. at 31, it acknowledged that the record did not contain the veteran's income information for any other year on appeal, *id.*, and it did not address whether his position with the building inspector's office was shielded in some respect from competition in the employment market due to his service-connected disabilities. Unfortunately, it is unclear from the Board decision exactly what standard it ultimately applied to determine that the veteran was not employed "in a protected environment." That lack of clarity frustrates judicial review and prevents Mr. LaBruzza from understanding the precise basis for the Board's decision.[8] *See Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1991) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.")).

Although we agree with the Board that Mr. LaBruzza's earned annual income of $198,147 in 2017 was categorically too high for his employment to qualify as "in a protected environment" for that year, *see* LaBruzza R. at 31, 423, we cannot conclude that his income in 2017 rendered harmless the Board's error in failing to apply the proper definition of that phrase to the other years on appeal. The record does not contain Mr. LaBruzza's income information before 2017, *see* LaBruzza R. at 31, and the Court is not free to speculate on that factual matter, even as part of our duty to take due account of the rule of prejudicial error. *See Tadlock v. McDonough*, 5 F.4th 1327, 1337 (Fed. Cir. 2021) (holding that the Court's statutory duty to consider prejudicial error "does

---

[8] This error is compounded by the Board's failure to address record evidence of workplace accommodations that may demonstrate the type of shielding from competition in the employment market contemplated by § 4.16(a), including the accommodations Mr. LaBruzza received related to his temper, confrontational and disrespectful behavior, impaired memory and concentration, inability to follow instructions, tardiness to meetings, lack of supervision, and significant underperformance due to service-connected PTSD and prostate cancer residuals. *See, e.g.*, LaBruzza R. at 158-60, 165, 175, 334, 591-92, 597, 604, 724-25, 729-30, 733; *see also Caluza v. Brown*, 7 Vet.App. 498, 506 (1995) (holding that the Board provides inadequate reasons or bases for its decision when it fails to account for and provide reasons for rejecting material evidence potentially favorable to the claimant), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table). For example, whether Mr. LaBruzza was held to an alternative set of performance standards from other employees that accounts for reduced productivity (or, as may occur in other situations, whether an employer continues to employ a veteran despite substandard or lower than satisfactory performance evaluations) may be relevant to the protected-environment inquiry. The Board should consider this evidence in accordance with our discussion in section IV.B.3, *supra*.

not give it the right to make de novo findings of fact or otherwise resolve matters that are open to debate"). We may affirm on harmless-error grounds "only if the record already contains findings made previously by the VA or the Board that support affirmance or the entire record makes evident that the Board could not have reached any other decision." *Id.* Because that is not the case here, we must remand Mr. LaBruzza's appeal for the Board to perform the necessary factual development and to properly apply the law. *See Byron v. Shinseki*, 670 F.3d 1202, 1205 (Fed. Cir. 2012) ("[W]hen the Board misinterprets the law and fails to make the relevant initial factual findings, 'the proper course . . . [is] to remand the case to the [Board] for further development and application of the correct law.'" (quoting *Hensley v. West*, 212 F.3d 1255, 1264 (Fed. Cir. 2000)) (second and third alterations in original)).

In Mr. McBride's case, the Board defined "employment in a protected environment," but did so in an unduly narrow fashion, stating that "a protected environment is an employment environment that would not exist, but for the willingness of the employer to hire and pay the employee for altruistic or personal reasons." McBride R. at 7. By limiting the concept of employment in a protected environment in this manner, the Board impermissibly narrowed the scope of § 4.16(a) in violation of the regulation's plain language as outlined above. *See Petite v. McDonough*, 35 Vet.App. 64, 73 (2021) (holding that the Board errs when it applies an unduly narrow interpretation of a statute or regulation that is not supported by the plain language of that statute or regulation). The Board improperly collapsed the fact-specific protected-environment inquiry into a single-factor test. As a consequence, the Board categorically dismissed evidence of "[t]he fact that the [v]eteran's employer may have made additional accommodations above and beyond what they [were] required to do by law," McBride R. at 8, evidence that was relevant and potentially favorable to his claim that he was employed "in a protected environment." Those errors rendered inadequate the Board's reasons or bases for denying Mr. McBride entitlement to TDIU, necessitating remand.[9] *See Caluza*, 7 Vet.App. at 506; *Gilbert*, 1 Vet.App. at 56-57.

We recognize, of course, that the Board did not have the benefit of this decision when it adjudicated Mr. LaBruzza's and Mr. McBride's appeals. Nor did it have instructions from the Secretary on how to apply that phrase in individual cases, despite repeated litigation over the issue

---

[9] This is not to say that the factors that the Board considered in Mr. LaBruzza's and Mr. McBride's cases were irrelevant to the protected-environment inquiry. As we noted earlier, the Board may consider any factor that tends to clarify whether a position was shielded in some respect from competition in the employment market, including an employer's intent.

and our insistence that he provide that very guidance to VA adjudicators. Nevertheless, because the Board misapplied the law in denying Mr. LaBruzza and Mr. McBride entitlement to TDIU for the periods on appeal, we will set aside those portions of the respective Board decisions and remand the matters for further development and readjudication. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate"); *see also Ray*, 31 Vet.App. at 74 (remanding for the Board to apply the Court's interpretation of a phrase in § 4.16(a) in the first instance).

## VI. CONCLUSION

Upon consideration of the foregoing, the portion of the March 9, 2021, Board decision in No. 21-4467 denying Mr. LaBruzza entitlement to TDIU prior to July 1, 2018, is SET ASIDE and that matter is REMANDED for further development and readjudication consistent with this decision. The balance of that appeal is DISMISSED.

Likewise, the September 3, 2020, Board decision in No. 20-8562 denying Mr. McBride entitlement to TDIU prior to November 11, 2013, is SET ASIDE and that matter is REMANDED for further development and readjudication consistent with this decision.